UNITED STATES, Appellee,

v.

Kerry S. EGGEN, Senior Airman,
U.S. Air Force, Appellant.

No. 98–0502.
Crim.App. No. 32541.

U.S. Court of Appeals for
the Armed Forces.

Argued April 13, 1999.

Decided July 30, 1999.

CRAWFORD, J., delivered the opinion of the Court in which COX, C.J., and SULLIVAN and EFFRON, JJ., joined. GIERKE, J., filed an opinion concurring in part, dissenting in part, and concurring in the result.

For Appellant: *Major Margo Stone Newton* (argued); *Colonel Douglas H. Kohrt* (on brief); *Colonel Theodore J. Fink.*

For Appellee: *Captain Martin J. Hindel* (argued); *Colonel Anthony P. Dattilo* and *Major Ronald A. Rodgers* (on brief).

Judge CRAWFORD delivered the opinion of the Court.

Contrary to his pleas, appellant was convicted by officer and enlisted members of forcible sodomy, in violation of Article 125, Uniform Code of Military Justice, 10 USC § 925. He was sentenced to a dishonorable discharge, 9 years' confinement, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved only so much of the sentence as provided for a dishonorable discharge, confinement for 1 year, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion on January 28, 1998. We granted review * of the following issues:

---

* This case was argued at Maxwell Air Force Base, Montgomery, Alabama, as part of the Court's Project Outreach. *See* 38 MJ 136, 137 n. 1 (CMA 1993).

I. WHETHER APPELLANT'S SUBSTANTIAL RIGHTS WERE PREJUDICED WHEN A GOVERNMENT EXPERT COMMENTED ON THE ALLEGED VICTIM'S CREDIBILITY.

II. WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY ALLOWING A GOVERNMENT EXPERT TO TESTIFY WITHOUT MEETING THE FOUR–PART TEST OF ADMISSIBILITY OF EXPERT TESTIMONY.

We affirm the decision of the Court of Criminal Appeals for the reasons set forth below.

## FACTS—ISSUE I

Some facts related to the offense are required to place this issue in context. Appellant was charged with forcible sodomy on a Sergeant (Sgt.) W, United States Marine Corps. The act had allegedly occurred following a night where both appellant and Sgt. W had consumed a large quantity of alcohol. W fell asleep and was awakened to find appellant performing fellatio on him.

Appellant's defense from the beginning was that the sexual act was drunken, but consensual. He further suggested that Sgt. W was lying to protect himself from being discovered as a homosexual and being separated from the military. Thus, the case centered on the credibility of the victim.

Major (Dr.) Claire Woods, Chief of Mental Health and Psychiatric Evaluation at Misawa Air Base, Japan, testified that she had counseled Sgt. W as a walk-in patient. Sgt. W sought help in coping on a day-to-day basis following the alleged sexual assault.

Trial defense counsel cross-examined Dr. Woods at some length about her conversations with Sgt. W. Defense counsel first focused on the inconsistencies between what Sgt. W told Dr. Woods and statements he had made to investigators of the Air Force Office of Special Investigations and counselors at the Family Advocacy Center. Defense counsel then turned to the question of whether Sgt. W may have been "faking" his emotional state when he visited Dr. Woods:

Q: You stated that Sergeant [W] was very emotional when he came in to see you?

A: Yes.

Q: Do you agree that sometimes people can fake emotions?

A: Yes.

Q: And people can fake their emotions for a variety of reasons?

A: Yes.

Q: They can fake an emotional state of anxiety or whatever when they come to see you, isn't that correct?

A: Yes.

Q: So, isn't it a possibility that Sergeant [W] was faking his emotional state when he came to see you?

A: Anything is a possibility.

Q: And you testified earlier that he was having marital difficulty with his wife, right?

A: Yes.

Q: And you said that if a man was concerned about his marital difficulties that the fact that it might jeopardize his career [sic], correct?

A: According to his report, yes.

Q: So, isn't it possible or a good possibility that behind the emotions that he was showing that day was the fact that he was concerned about his career, that he was concerned about his marital difficulties?

A: I think it was very obvious as part of his presentation was secondary to those [sic].

Defense counsel then engaged Dr. Woods in the following colloquy:

Q: As far as man and mammals and that type of thing, homosexuality is not unusual but are not the typical [sic]. Is that a fair statement?

A: (No response.)

Q: A man is a mammal and in the animal world there are homosexual acts that go on all the time?

A: Yes.

Q: So, it is not unusual for it to happen to man?

A: I don't know if unusual would be the word, but it is not unheard of. Homosexuality is not considered a pathologic state.

Q: Wouldn't you agree that anxiety or the emotions that Sergeant [W] displayed could possibly have come from the fact that he did consent to what happened and that he was embarrassed about what happened? Is that also a possibility and that is where anxiety stems from people finding out?

A: All things considered, I think that needs to be addressed, yes.

On redirect examination, trial counsel asked Dr. Woods if she had "any indication" that the information Sgt. W gave her "was false," to which she replied that she did not. He also asked her if inconsistencies between what Sgt. W had told her and the statement W had given the investigators would cause her to "change" her mind about his credibility. Again, she replied that it would not.

Trial counsel then asked Major Woods the following questions:

Q: Okay. Now, you talked about how people could fake emotions, correct?

A: Yes.

Q: Now, you saw Sergeant [W] about six to eight times, right?

A: At least, yes.

Q: And you talked to him for at least an hour or so each time, right?

A: Yes.

Q: During all those several hours that you were talking to him, did you feel that you were being faked to?

A: No.

Q: Have you ever had people fake emotions to you and you would have caught it?

A: Yes.

Q: And that is part of your job as a psychiatrist, right?

A: Yes.

Q: And, you probably see people talking about emotions dozens of times a week, right?

A: Potentially, yes.

Q: For the last several years?

A: Yes.

Q: How would you rate yourself in being able to judge fakers as opposed to people who are telling the truth?

A: I would like to think that I'm pretty good at picking up people who are telling the truth.

Q: Is that part of your job?

A: Yes.

There was no objection to any of this testimony. Therefore, if there is error, appellant must demonstrate that the Court should invoke the plain-error rule. *See* Mil. R.Evid. 103, Manual for Courts–Martial, United States (1998 edition).

Appellant now argues that the questions concerning whether Sgt. W was "faking" his emotions and whether he was being truthful with Major Woods amounted to an impermissible expert opinion on credibility. Final Brief at 7–9.

The Government responds that the failure to object constitutes forfeiture of the issue absent plain error. Answer to Final Brief at 3. The Government points out that *no* questions were asked about Sgt. W's truthfulness on direct, but that this subject was pursued on cross-examination. *Id.* at 4–5.

## DISCUSSION—ISSUE I

As to this issue we will address both the plain-error and invited-error doctrines.

■ While it is true that these questions required Dr. Woods to express her opinion, it seems clear that when the testimony is placed in context, it certainly did not amount to prejudicial plain·error. *See United States v. Powell*, 49 MJ 460 (1998). If one were to remove this testimony from the area of mental health, and the expert being questioned was a neurologist or an orthopedic surgeon, as to whether the victim were in physical pain or whether he/she were faking certain physical symptoms, there is no doubt that such a witness could testify as to those conditions. Furthermore, any potential error from this testimony was more than cured by Judge McCormack's instructions on expert testimony. Apparently, he recognized that the testimony of Major Woods, as well as two other doctors, was susceptible to being inter-

preted as an expert opinion on truthfulness. On his own he modified the standard instruction on credibility as follows:

> Now, you are advised also that only you, the members of the court, determine the credibility of the witnesses and what the facts of this case are. No expert witness or other witness can testify that the alleged victim's or witness' account of what occurred is true or credible. That the expert witness believes the alleged victim or another witness or that the sexual encounter of the nature charged in this case occurred in the manner that it did, that is alleged, to the extent that you believe that any of these witnesses testified or implied that they believed the alleged victim or another witness or that the crime occurred in a particular manner, or that the alleged victim or any other witness is credible, you may not consider this as evidence that a crime occurred in that manner or that the alleged victim or witness is credible.

Moreover, it was defense counsel who first suggested that Sgt. W was not being truthful about the symptoms (emotions) he displayed during Dr. Woods' interviews with him.

In effect, the actions by the defense counsel opened the door for this examination by the prosecutor. Any error was induced or "invited" by the defense. *United States v. Raya*, 45 MJ 251, 254 (1996); *United States v. Schnitzer*, 44 MJ 380, 384 n. 1 (1996) (separate opinion); *United States v. Cacy*, 43 MJ 214, 218 (1995). As the court below, 1998 WL 48618, noted:

> Here the expert's testimony was elicited by the defense counsel. On cross-examination Major Woods testified concerning the victim's truthfulness and whether it appeared the victim was faking his emotional state. The trial counsel was not precluded from rehabilitating his expert's testimony.

Unpub. op. at 4.

The inadmissible evidence was brought before the members by the defense in this case, not the Government. In *Raya, supra* at 254, the Court stated: "Appellant cannot create error and then take advantage of a situation of his own making. Invited error does not provide a basis for relief."

Thus, we hold that there was no prejudicial plain error and, in any event, any error was invited by the defense.

## FACTS—ISSUE II

■ As to this issue, Major (Dr.) Michael McConnell, former Chief of the Sex Offender Treatment Program at the Naval Consolidated Brig, testified for the Government about common reactions of adult male sexual assault victims. When trial counsel began to qualify Dr. McConnell, defense counsel stated that he would stipulate that Dr. McConnell was an expert on adult male sexual offenders and victims.

Again, as with Dr. Woods, trial defense counsel attempted to utilize Dr. McConnell to advance appellant's theory that any sexual contact had been consensual and that Sgt. W was lying about the nature of the act. He specifically asked Dr. McConnell, "Isn't it a fair statement that people can make false statements?" Over trial counsel's objection, Dr. McConnell was permitted to answer this question.

The following colloquy between defense counsel and Dr. McConnell then ensued:

Q: So, in other words, Sergeant [W] can be concerned about something and lie to conceal the fact it was consensual?

A: It certainly could be in the realm of possibility. I guess the sexual offender could lie to conceal an act of the sexual offender.

Q: Well, wouldn't you say that if somebody had a concern about his career being in jeopardy that he would have some concerns about lying?

A: I think Senior Airman Eggen definitely has concerns about his career.

Q: How about Sergeant [W], if he admits that he consented to a homosexual act, don't you think he is going to get in trouble with his career also?

A: I think that anyone who consented to a homosexual act currently would be in trouble with their career.

Q: So, Sergeant [W] has some motive to lie doesn't he? If he consented to it, then his career is in jeopardy, right?

A: I assume that would be the same for anybody in that circumstances [sic].

Q: Maybe he had a motive to lie if you not considered [sic] engaging in a homosexual act and you consented to a homosexual act then you are concerned that people found out about that homosexual act, don't you think that someone might want to conceal that and not have other people find out about it?

A: Well, I think that possibly the greatest motivation would be not to go to prison. The "would not to go [sic] to prison" would outweigh his military career.

Q: Do you think an embarrassment of telling people that you engaged in a homosexual act would personally want to go to jail [sic]? That Sergeant [W] would rather to go to jail?

A: I don't necessarily assume that because there are cases where people have willingly come forward in the military context and acknowledged that they are homosexual.

Q: There's a lot of them out there haven't been [sic] or came out and said they were a homosexual.

A: I don't know.

Q: Don't you think that somebody who engaged in a homosexual act would have some concern for his self esteem if other people found [sic] about it and he is supposed to be a Marine, he is supposed to be tough? Wouldn't you think he had the motive for lying to cover that up?

A: If there was someone who participated in a nonconsensual [sic] homosexual act where they were concerned about their career and they didn't want to come out of the closet and deal with repercussions, yeah they might be lying, I guess.

Q: So, in other words there is another reason why Sergeant [W] could lie to conceal what had actually happened that night?

A: I can't speak to what his reasons might be but in general I would think either one of those circumstances that you explained—I'm a little confused about your question.

Q: I'm just saying that Sergeant [W] has the motive to lie. The thing that happened was consensual, he has the motives to lie because he is concerned about his career, he is concerned about what other people are thinking and what would you think of [sic] the consequences would be if you found out a Marine was a homosexual or committed a homosexual act?

A: For all those reasons, that is why I find it inconsistent that it was a consensual act.

This line of questioning continued for a number of pages in the record with defense counsel attempting to establish that Sgt. W had a motive to lie about the incident.

On redirect examination, trial counsel asked the following questions:

Q: Doctor McConnell, one question. Isn't it just as possible that the Accused has a great deal to lose here and has a very good motive to lie about what happened in that room with Sergeant [W]?

A: I think that given the facts as I know them, the Accused has much more to lose. In the context of what I experienced working with, with folks who perpetrated sexual offenses, some of whom I saw when they were in prison was [sic] charged and convicted, they did everything possible to attempt to get out of going to prison or the same embarrassment for themselves and their families because many of the folks I worked with in prison who were charged and convicted . . .

DC: Objection. This is dealing with perpetrator evidence, Your Honor.

TC: Your Honor, the Defense brought it up, motive to lie.

MJ: I'll allow the witness to continue.

TC: Please continue.

WIT: Even in the context of folks who are already incarcerated for sexual offenses, who have a lot to lose including their military careers, ability to remain with their family and support their family, folks were willing to risk a lot in the context after already been caught, many of them who were quite open about the extent they

went to, to lie to prevent themselves ending up in prison or losing their families or losing their military careers. And, for someone who is charged with the offense that we are addressing here today, there is much more to lose for that person than I would assume there would be to lose for someone like Sergeant [W].

When the full extent of Dr. McConnell's testimony is read in context, it seems clear that as with Dr. Woods, the testimony complained of on appeal was induced by defense counsel's cross-examination which attempted to explore whether Sgt. W was lying in his testimony. Further, it seems clear that trial defense counsel did not object to the testimony of Dr. McConnell on the basis that he had exceeded the area of his expertise. As such, that issue was waived for appeal. See Mil. R.Evid. 103(a)(1). Finally, as noted with regard to Granted Issue I, Judge McCormack gave an instruction (quoted above) which defined the proper bounds of expert testimony for the members and thus precluded any prejudice to appellant. *See United States v. Powell, supra.*

Thus, we hold against appellant.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

GIERKE, Judge (concurring in part, dissenting in part, and concurring in the result):

I agree with the majority's disposition of Issue I. I disagree with its disposition of Issue II.

I disagree with the characterization of this case as a credibility battle. Because appellant did not testify, his credibility was not in issue, and the evidence regarding his motive to lie was irrelevant.

Furthermore, I believe that admission of the testimony of Major McConnell concerning appellant's motive to lie was constitutional error. Asking court members to infer that an accused is lying merely because he is an accused undermines the presumption of innocence. *See generally Mahorney v. Wallman,*

917 F.2d 469 (10th Cir.1990) (prosecution argument that presumption of innocence had been eliminated was constitutional error); *see also United States v. Carpenter,* 51 MJ 393, 397 (1999) (prosecutor "treading on dangerous ground" by commenting on exercise of constitutional rights).

In this case the prosecution introduced evidence of appellant's statements to an OSI agent and then used expert testimony to suggest that some of those statements were false, based solely on the fact that appellant was accused of a crime. In my view, it is impermissible to use expert testimony to opine on the truthfulness of evidence. *See United States v. Arruza,* 26 MJ 234, 237 (CMA 1988), and cases cited therein, *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989).

I also do not believe that the defense opened the door by suggesting that the victim may have been faking his symptoms when he was seen by Maj Woods. If the defense had shown that the victim had a felony conviction, that would not open the door to evidence that the accused also had a felony conviction. In my view, there is no logical connection between a suggestion that a victim may have faked his symptoms and an assertion that an accused is lying, especially when the accused does not testify.

Finally, I do not agree that the issue was waived. Defense counsel objected on the ground that the testimony of Maj McConnell was "perpetrator evidence." While this objection may have been inartfully phrased, it was clear to the military judge that the defense was objecting to testimony that appellant had a motive to lie merely because he was accused of a crime. For the reasons stated above, I believe that the objection was meritorious and should have been sustained.

Although I believe that the military judge erred, I am satisfied beyond a reasonable doubt, based on the military judge's detailed credibility instruction and the evidence of record, that the error was harmless. Accordingly, I concur in the result.